# EXHIBIT A

(TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED:
TORT - MOTOR VEHICLE TORT - CONTRACT -
EQUITABLE RELIEF - OTHER)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 2182-CV-00965

Sophia Cotton _____, Plaintiff(s)

v.

Southwest Boston Senior Services Inc. Defendant(s)
d/b/a Ethos

### SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon Emily Smith-Lee, plaintiff's attorney, whose address is 46 South Main St, Sharon, MA 02067, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, HEIDI E. BRIEGER, Esquire at _____ the _____ day of _____, in the year of our Lord two thousand and _____

_____ Clerk.

NOTES:
1. This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

12321

2.0

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 21cv0965 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| | | COUNTY: Norfolk Superior Court (Dedham) |

| Plaintiff: Sophia Cotton | Defendant: Southwest Boston Senior Services Inc. DBA Ethos |
|---|---|
| ADDRESS: | ADDRESS: 555 Armory Street |
| | Boston MA 02130 |
| Plaintiff Attorney: Emily Smith-Lee, slnlaw | Defendant Attorney: |
| ADDRESS: 46 South Main Street | ADDRESS: |
| Sharon MA 02067 | |
| 781-784-2322 | |
| BBO: 634223 | BBO: |

### TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B22 | Employment Discrimination | F | ☒ YES   ☐ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A?    ☐ YES   ☒ NO
Is there a class action under Mass. R. Civ. P. 23?    ☐ YES   ☒ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date
  1. Total hospital expenses
  2. Total doctor expenses
  3. Total chiropractic expenses
  4. Total physical therapy expenses
  5. Total other expenses (describe below)

RECEIVED 10/19/2021

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date     $17,000.00
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages     $136,000.00
F. Other documented items of damages (describe below)
Emotional Distress and Attorneys Fees, TBD

TOTAL (A-F):    $153,000.00

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

Signature of Attorney/Unrepresented Plaintiff: X     Date:

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X   /s/ Emily Smith-Lee     Date: October 19, 2021

SC0001: 1/22/2021     www.mass.gov/courts     Date/Time Printed:10-19-2021 12:35:53

RECEIVED 10/19/2021

1.0

COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT DEPARTMENT

NORFOLK, SS

SUPERIOR COURT
CIVIL ACTION NO.: 21cv0065

SOPHIA COTTON,

    Plaintiff,

v.

SOUTHWEST BOSTON SENIOR SERVICES INC., D/B/A ETHOS,

    Defendant.

## COMPLAINT

### Introduction

This case arises from Defendant's retaliatory and discriminatory actions against Plaintiff Sophia Cotton, as a result of Ms. Cotton's age and/or perceived and/or actual disabilities and request for accommodation.

### Parties

1. Plaintiff Sophia Cotton is an adult resident of 6 Feener Circle, Randolph Massachusetts.

2. Defendant Southwest Boston Senior Services Inc., *dba* Ethos, is a Massachusetts nonprofit corporation with a principal office located at 555 Armory Street, Jamaica Plain, MA, 02130.

### Jurisdiction

3. On March 3, 2021 Plaintiff filed a complaint of Discrimination against Southwest Boston Senior Services, Inc. d/b/a Ethos with The Massachusetts Commission Against Discrimination ("MCAD") pursuant to M.G.L. c. 151B, §5.

4. On or about June 25, 2021 Plaintiff filed a withdrawal form with the MCAD indicating that she wished to pursue a private right of action in civil court.

5. This Court has personal jurisdiction over Defendant Southwest Boston Senior Services, Inc. d/b/a Ethos, because its principal place of business is within the Commonwealth, it does substantial business within the Commonwealth, and this dispute arises out of its contacts with the Plaintiff in the Commonwealth.

6. Venue is proper in this Court pursuant to G.L. c. 223, § 2, because Plaintiff resides Norfolk County.

## Factual Allegations

7. Ms. Cotton was most recently employed by Ethos from 2013 until July 19, 2021.

8. Throughout the years, she has received overall positive performance assessments, with overall ratings between "meets" and "exceeds" expectations in each year from 2013 through 2018.

9. In 2019, she experienced some health problems, and for the first time received an overall rating just barely below "meets" expectations (a 3.98 instead of 4.00).

10. In her narrative comments, her supervisor focused heavily on her health problems and how those had affected her performance.

11. From the time of that evaluation until the beginning of the COVID-19 crisis, Ms. Cotton continued to perform her duties.

12. Despite regular supervision meetings with the CEO, Valerie Frias, Ms. Cotton was never told during that time period that there were problems with her job performance or that she was not meeting expectations.

13. In March, 2020, an email was sent to all Ethos employees outlining conditions that the CDC had determined put individuals at higher risk from complications with COVID-19,

stating that employees were "strongly encouraged" to reach out to discuss accommodations.

14. Ms. Cotton responded, informing Ms. Frias and the Human Resources Director, Lisa Gioiosa, that she had Type 2 diabetes and a heart condition.

15. For some time thereafter, Ms. Cotton, as well as other employees, worked from home, until Ms. Frias informed her that she (Ms. Frias) was going to start coming in two days a week, and therefore Ms. Cotton would have to do so as well.

16. Though uncomfortable with the health risks to her of going into an office anywhere, as well as with the thoroughness of the cleaning protocols at Ethos, Ms. Cotton did as she was instructed and came into the office two days a week.

17. In August, 2020, while on a zoom call in the office, Ms. Cotton had an acute health episode which caused her to vomit and need to exit the zoom meeting.

18. Ms. Frias came to her office, opened her office door with her foot, and had Ms. Cotton taken to the hospital via ambulance.

19. Almost immediately after her return to work from this incident, Ms. Frias began pressuring her to take a medical leave.

20. Though Ms. Cotton (who had recovered from the acute episode and was mainly concerned about her possible exposure to COVID-19) did not wish to take a leave, Ms. Frias made it clear that if she did not go out on medical leave, she would be put on a performance management plan.

21. Prior to this acute medical episode, Ms. Frias had not reported any concern with Ms. Cotton's overall performance in their regular supervision meetings.

22. In September 2020, Ms. Frias sent her an email stating:

> I have been having concerns about your performance at work- your ability to remember detail, confusion in emails and conversations (not only with me- others have brought to my attention re: your interactions with them).

23. In this email, Ms. Frias compared Ms. Cotton's ability to remember instructions to that of a younger employee.

24. On September 18, 2020, Ms. Frias, Ms. Gioiosa and Ms. Cotton participated in a conference call.

25. Ms. Frias opened the meeting by asking if Ms. Cotton had made "a different decision about medical leave."

26. Ms. Cotton clarified that this meant her changing her mind and deciding to take the leave. Once confirmed, she stated she would be taking the leave.

27. At that point Ms. Frias said "that changes what we have to talk about today," and re-directed the conversation to the paperwork and process required to initiate the medical leave.

28. As she felt she had no other choice based upon Ms. Frias' statements and actions, Ms. Cotton did take a medical leave, beginning on September 19, 2020, shortly after this conversation.

29. The circumstances of being pushed into medical leave and the increasing scrutiny she fell under following her acute medical episode only increased Ms. Cotton's anxiety, to the point where her physician requested additional weeks of leave due to her "severe anxiety on top of depression."

30. As Ms. Cotton's leave drew to a close, she engaged in correspondence with Ms. Gioiosa about her return.

31. She was told that she would need to come back in person two days a week, or have her full time hours reduced to 15 hours a week if she wanted to work remotely.

32. Ms. Cotton requested that she be allowed to work remotely as an accommodation for her underlying medical conditions (diabetes and a heart condition) which placed her at an increased risk of complications due to COVID-19.

33. Her request for accommodation was also based on her anxiety and depression that had developed and/or worsened as a result of the events leading to her medical leave.

34. On or about December 28, 2020, Ms. Cotton wrote to specifically clarify that she was ready, willing and able to work but needed the accommodation of working those hours from home due to her underlying medical conditions and mental health situation.

35. Ms. Gioiosa responded that they estimated only 15 hours per week of her job could be done at home, and again made clear that if she wanted to maintain her full time status and compensation she would have to agree to come in two days per week.

36. There was no interactive dialogue about how her medical vulnerabilities could be accommodated short of her physical presence in the office.

37. Upon returning to work remotely, however, Ms. Cotton discovered that virtually the same things were expected of her as before her leave.

38. In her first week back, she was criticized for not completing something on the same day, even though it would have taken her outside of the hours she was told she was expected to work.

39. She emailed Ms. Gioiosa to get a better understanding of what was expected of her. Ms. Gioiosa, revealing her growing hostility toward Ms. Cotton, quoted an earlier email about the hourly arrangement, then stated "what was confusing about that?"

40. Ms. Cotton was ultimately told she should work as many hours as needed to complete her assigned tasks, but when she submitted timecards for 24 hours the first week and 28.5 the

second, she was questioned by Ms. Frias and told she had to start reporting time spent on each task during the day.

41. Despite having worked remotely for much of 2020, this was the first time she had ever been asked to track such detail.

42. Ms. Cotton is 59 years old.

43. The individual who took on many of her responsibilities during her leave, and who appeared to be in line to take over her responsibilities, is in his thirties.

44. Though Ms. Cotton requested extended leave as an accommodation, Defendant refused to extend it in July, 2019.

45. On information and belief, other similarly situated employees have been given extended leave beyond the FMLA time period as an accommodation.

46. These individuals include Jarrod Clark, Joanne Leamy, Sonja Dahlberg, and Joyce Wardle.

47. None of these individuals were members of all of the protected classes to which Ms. Cotton belongs.

48. Ms. Cotton's employment was terminated on or about July 19, 2021.

49. On information and belief, all of Defendant's actions toward Ms. Cotton from the time of her acute medical episode in the summer of 2020 were taken for the purpose of inducing or compelling her resignation.

## COUNT I
**Violation of M.G.L. c. 151B and 41 U.S.C. §12101, *et seq* – Disability Discrimination**

50. Plaintiff reasserts and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

51. After her surgery, Ms. Cotton suffered from a disability or handicap, for an extended period of time, as defined by American Disability Association and M.G.L. c. 151B.

52. Ms. Cotton was nevertheless able to perform the essential functions of her job with reasonable accommodation.

53. Ms. Cotton suffered adverse employment action as a result of her disability or handicap, including but not limited to (a) being forced into an unwanted medical leave in September, 2020; (b) refusal to accommodate her underlying medical conditions upon her return from leave in January 2021, resulting in decreased compensation; (c) actions taken with the intent of compelling her resignation; and (d) the ultimate termination of her employment in July, 2021.

54. On information and belief, Defendant's actions as alleged herein were based in whole or in part on Ms. Cotton's disabilities.

55. Ms. Cotton suffered and continues to suffer damages as a result of Defendant's violations.

## COUNT II
### Violation of M.G.L. c. 151B and 41 U.S.C. §12101, *et seq.*– Perceived Disability Discrimination

56. Plaintiff reasserts and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

57. Defendant believed that Ms. Cotton was disabled as a result of the underlying medical conditions she disclosed early in the COVID-19 pandemic and her acute (but transient) medical issue in approximately August 2020.

58. As a result of this perception, Defendant forced Ms. Cotton into a medical leave in September, 2020.

59. Also as a result of this perception, Defendant made efforts to push Ms. Cotton out of her position once she returned from leave, including forcing her to work reduced hours but enforcing a full time work expectation on her, subjecting her to increased scrutiny and micromanagement, and exhibiting increased hostility toward her from her supervisor and from the Human Resources Director.

60. Ms. Cotton was nevertheless able to perform the essential functions of her job with reasonable accommodation.

61. Ms. Cotton suffered adverse employment action as a result of her perceived disability or handicap, including but not limited to (a) being forced into an unwanted medical leave in September, 2020; (b) refusal to accommodate her underlying medical conditions upon her return from leave in January 2021, resulting in decreased compensation; (c) actions taken with the intent of compelling her resignation; and (d) the ultimate termination of her employment in July, 2021.

62. On information and belief, Defendant's actions as alleged herein were based in whole or in part on Ms. Cotton's perceived disabilities.

63. Ms. Cotton suffered and continues to suffer damages as a result of Defendant's violations.

**COUNT III**
**Violation of M.G.L. c. 151B and 29 U.S.C.A. § 621 *et seq* – Age Discrimination**

64. Plaintiff re-alleges and re-asserts the allegations in the above paragraphs as if fully set forth herein.

65. Ms. Cotton suffered adverse employment action as a result of her perceived disability or handicap, including but not limited to (a) being forced into an unwanted medical leave in September, 2020; (b) refusal to accommodate her underlying medical conditions upon her

return from leave in January 2021, resulting in decreased compensation; (c) actions taken with the intent of compelling her resignation; and (d) the ultimate termination of her employment in July, 2021.

66. By its actions as alleged herein, including without limitation forcing her on leave in September 2020 based on unfounded concerns about her physical health; comparing her memory and speed to that of a younger employee and apparently grooming that younger employee to assume her responsibilities; taking actions to compel her resignation; and ultimately terminating her employment, Defendant violated state and federal law prohibiting age discrimination in employment.

67. On information and belief, Defendant's actions as alleged herein were based in whole or in part on Ms. Cotton's age, alone or in combination with her disabilities and/or perceived disabilities.

68. Ms. Cotton suffered and continues to suffer damages as a result of Defendant's violations.

## COUNT IV
### Violation of 29 U.S.C. § 2612

69. Ms. Cotton re-alleges and reasserts the allegations in the preceding paragraphs as if fully set forth herein.

70. 29 C.F.R. § 825.220 provides that an employer is prohibited from discriminating against employees who have used FMLA leave.

71. After being forced into FMLA leave in September, 2020, Ms. Cotton needed to extend that leave due to her mental health disorders.

72. On information and belief, Ethos' adverse actions toward Ms. Cotton immediately prior to and after her return, including reducing her hours and refusing to make reasonable accommodations, were retaliatory and in violation of 29 U.S.C. § 2612.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff claims:

1. Damages in an amount to be determined at hearing, including but not limited to damages for lost pay, multiple damages, punitive damages, emotional distress, out-of-pocket expenses and/or other monetary losses;
2. Costs and attorneys' fees; and
3. Such other legal or equitable relief as the Court may award.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

> Respectfully submitted,
> SOPHIA COTTON,
> By her attorneys:
>
> */s/ Emily Smith-Lee*
>
> Emily Smith-Lee (BBO#634223)
> SLN LAW, LLC
> 46 South Main Street
> Sharon, MA  02067
> (781)784-2322

Dated:  October 19, 2021